STATE *EX REL.* GWYNN v. CITIZENS' TELEPHONE CO.

1. COMMON CARRIER—MANDAMUS.—A TELEPHONE COMPANY is such quasi common carrier that it is bound to supply all alike who are in like circumstances with similar facilities under reasonable limitations without discrimination, and upon its refusal to do so, it may be compelled by mandamus.

2. IBID.—IBID.—IBID.—PRACTICE.—That an individual applying for such facilities has not complied with a previous contract with respondent, whereby he agreed to use respondent's telephone exclusively, is no defense to a petition asking for a mandamus requiring respondent to furnish petitioner with its facilities, but the remedy of respondent is to sue petitioner for damages for breach of such contract.

3. MANDAMUS—PRACTICE—RETURN.—That respondent has not means to at once comply with demand of petitioner for mandamus is sufficient return to rule to prevent order requiring immediate compliance.

Before BUCHANAN, J., Spartanburg, March, 1900. Reversed.

Petition by J. B. Gwynn for mandamus against Citizens' Telephone Co., requiring it to place a telephone in his store and in his residence. From order refusing the writ, petitioner appeals.

*Mr. H. E. DePass,* for appellant, cites: *Telephones are common carriers (a) under the common law:* 52 Am. R., 404; 8 Am. & Eng. Corp. Ca., 1; 48 Am. St. R., 734; 19 S. C., 355; 6 Ency., 524; 8 Ency., 588, 612; *(b) under Constitution and statutes of this State:* Acts 1899, p. 61; Con., art. IX., sec. 3. *Obligations as common carriers (a) under the common law:* 19 S. C., 364; 22 Wall., 129; 16 Wall., 324; 52 Am. R., 409; 24 Ill., 426; 5 S. C., 358; 66 Md., 399; 23 Fed. R., 539; 17 At. R., 1071; 3 At. R., 825; 19 Abb. M. C., 466; 3 U. S. C. App., 30; *(b) under statute:* Con., art. IX., sec. 5; acts 1899, p. 61. *Mandamus is proper remedy:* 49 Ill., 33; 29 Conn., 338; 24 N. Y., 261; 56 Ill., 365; 36 Ohio St., 296; 52 Am. R., 404; 91 Ga., 400; 3 U. S. C. App., 30; 14 Ency., 152; 10 Am. St. R., 114.

. *Messrs. Simpson & Bomar*, contra, cite: *In South Carolina, telephone companies are not common carriers, and principles of law applicable to them do not apply to telephone companes:* 19 S. C., 83; Con., art. IX., sec. 3; art. VIII., sec. 3, Con.    *The trend of legislation here is to the effect that telephone companies are not common carriers:* Acts 1898, pp. 779, 780.    *The right being doubtful, or petitioner having another adequate remedy, prevents issuance of writ:* 18 S. C., 250; 139 U. S., 79.

July 12, 1901.    The opinion of the Court was delivered by

MR. CHIEF JUSTICE MCIVER.    This was an application, addressed to the Circuit Court, for a writ of mandamus, requiring the respondent to place a telephone in the relator's grocery store and one in his residence, in the city of Spartanburg, and to connect them properly with its exchange and its subscribers, and to do all acts necessary to afford the relator the like service and telephonic communication afforded to its other subscribers.    The application was refused by the Circuit Judge, and the relator appealed to this Court on the several grounds set out in the record, which it is not necessary to state here, as it will be sufficient to consider the several questions, as stated by counsel for respondent, in his argument here, which are presented by this appeal.

As is said by the Circuit Judge in his decree, "there is practically no dispute as to the facts," which may be stated, substantially, as follows: The relator is now and has been since the 28th of June, 1898, engaged in the mercantile business, carrying on a retail grocery store in the city of Spartanburg, and occupies a residence in said city; that the respondent, on 16th day of August, 1898, became a corporation under the laws of this State, for the purpose of owning, constructing, using and maintaining electric telephone lines and exchange within the city of Spartanburg, and as such is now and was at the time of the commencement of this proceeding engaged in the said business, having established an

exchange in said city, from which connections were made to telephone instruments in offices, places of business and residences of its subscribers; that the city council of Spartanburg has authorized the respondent to erect poles in the streets of the city for the purpose of transporting news over its wires to its subscribers, having a system of wires throughout the city, connected with telephone instruments furnished by it to its subscribers; that whenever a person desires a telephone, it is placed in the office, residence or place of business of the applicant, at the expense of the respondent, with authority to the subscriber to use the same, upon certain rates and terms, for the purpose of telephonic communication with others; that some time in the year 1899, the respondent placed telephones in relator's residence and grocery store, giving proper connections with respondent's exchange and its subscribers or customers throughout the city of Spartanburg and elsewhere; that this was done under an agreement with the relator that he would use respondent's telephones exclusively, and not the telephone of the Bell Telephone Company, and that certain of respondent's subscribers in the said city of Spartanburg, including most of the grocerymen, were furnished with telephones by the respondent, under a similar agreement, but some of respondent's subscribers, including some merchants, physicians and others and one groceryman, whose place of business was on the same street of said city as the grocery store of relator, were supplied with telephones by respondent under agreements which contained no such stipulation as to the exclusive use of respondent's telephones, and they were using both telephones; that on or about the 6th of February, 1900, the respondent learning that the relator had purchased Holland's market, in which there was a telephone placed there by the Southern Bell Telephone Company, a corporation duly chartered under the laws of this State, and that said market immediately adjoined relator's grocery store, and that relator had cut a door through the wall separating his grocery store from said market, thus opening a means of communication

between the two structures, immediately removed, against the protest of the relator, the telephones which the respondent had previously placed in relator's grocery store and residence, for the avowed purpose of preventing the relator from using respondent's telephones while he was using the Bell Telephone—respondent claiming that under its agreement with relator he was bound to confine himself to the use of respondent's telephones; that on or about the 8th of February, 1900, the relator tendered to respondent the amount due for the past use of respondent's telephones, which was accepted, and that relator thereupon demanded that respondent place one of their telephones in his grocery store and one in his residence, with proper connections with respondent's exchange and its subscribers; but the respondent refused to comply with such demand unless the relator would agree to use respondent's telephones exclusively, and not use the telephone which had been placed in said market by the Bell Telephone Company.

The respondent, in its answer, alleges: "that its supply of telephone instruments is limited, and that it is with difficulty that this respondent can furnish such instruments to all applicants therefor. That even if the respondent was legally bound to furnish such instruments now, it would be impossi- for it to do so within less than sixty days, for the reason of its inability to enlarge its switch-board." But as this allegation is not responsive to any allegation contained in relator's petition, and was not sustained by any evidence, so far as the "Case" shows, it cannot now be considered. Besides, this Court, having reached the conclusion, as will presently appear, that the relator is entitled to the mandamus for which purpose the case will be remanded to the Circuit Court, with instructions to carry out the views herein announced, that Court can, in its order directing the writ of mandamus to be issued, make such provision, by giving a reasonable time within which the duty sought to be enforced shall be performed, provided the fact be as alleged in the foregoing quotation from respondent's answer.

We will next proceed to consider the several questions of law, growing out of the facts above stated, and presented by this appeal. These questions are thus stated in the argument here, on the part of the respondent, and we propose to adopt that statement.    1st. Is the defendant telephone company, in any sense, a common carrier? 2. Can the defendant telephone company be required, in any case, against its will, to supply one of its instruments to petitioner? 3. Can the defendant telephone company be required by mandamus, under the circumstances of this case, to so furnish its instruments to petitioner?

The first and, as it seems to us, the controlling question in the case, is, we think, conclusively determined by the provisions of sec. 3, of art. IX., of the present Constitution, which reads as follows: "All railroad, express, canal and other corporations engaged in the transportation for hire and all telegraph and other corporations engaged in the business of transmitting intelligence for hire, are common carriers in their respective lines of business, and are subject to liability and taxation as such," the balance of the section not being pertinent to the present inquiry. Now, if the respondent, "Citizens' Telephone Company," is a corporation, and is "engaged in the business of transmitting intelligence for hire," then it is expressly declared by the highest authority to be a common carrier. That it is a corporation, is not and cannot be denied; and, as we think, it is equally undeniable that it is "engaged in the business of transmitting intelligence for hire." Indeed, that, so far as appears in this case, is the only business in which it is engaged. The distinction sought to be drawn by counsel for respondent in his argument here, between the mode of transmitting intelligence or a message, as it is usually called by telegraph and by telephone, is a distinction without a difference, so far as the question with which we are concerned is involved. While it is true that a person desiring to send a message by telegraph to another usually writes out his message and

delivers it to the agent of the telegraph company (though we see no reason why it may not be delivered by word of mouth, or over a telephone, as no doubt is frequently the case) and the agent transmits such message, through the agency of instrumentalities provided by the telegraph company, to another agent of such company at its destination, who writes it out, or delivers it by word of mouth or over a telephone, to the person for whom such message is intended, whereas a person desiring to send a message by telephone simply goes to the instrument provided for the purpose by the telephone company, calls up the agent of the company at the central office and expresses his desire to be connected with the person to whom he wishes to speak, which being done by the agent of the company at the central office, the message is delivered directly to the person for whom it is intended, through the instrument and over the wires provided by the telephone company for the purpose. In both instances the intelligence or message is actually transmitted by the use of agencies and instrumentalities furnished either by the telegraph or the telephone company, for which they are entitled to receive proper compensation; and one is just as much engaged in the business of transmitting intelligence for hire as the other. Both are devices by which one person is enabled to communicate with another beyond the reach of the human voice, unaided by some artificial appliance; and although there are some differences *in the mode* of transmitting intelligence, yet the end sought and attained by each is substantially the same. Again, it is argued that there is another difference between the telegraph and the telephone which differentiates the former from the latter, and prevents legislative or constitutional provisions expressly applying to the former from being applied to the latter, and that is in the one case the purport of the message or intelligence to be transmitted must be known to the agent of the company, while in the other it need not be. In the first place, this difference does not always exist, as a matter of fact, for in many cases the purport of messages sent by tele-

graph are just as effectually concealed from the agent of the telegraph company as a message sent by telephone—in fact, more so—for in the case of a telegram in cipher, which is quite common, the purport of the message is entirely concealed, and is intended to be concealed from the knowledge of the telegraph operator and from every one else, except a person holding the key to the cipher; while, on the other hand, messages sent by telephone are not, as matter of fact, always concealed from the knowledge of the agent of the telephone company, nor from third persons who may choose to listen. But even if such differences did exist, it is difficult to conceive how that would affect the substantial identity of the business in which the two companies are engaged.

Again, it is argued that the framers of the Constitution being, as they were, familiar with the use of the telephone, would, if they had intended to include telephone companies within the provisions of the section of the Constitution above quoted, have mentioned such companies by name. This argument is based upon a misconception of the fundamental idea of the Constitution, which is that such an instrument is the *organic* law, and deals with general principles, and does not and should not descend into details. But the conclusive answer to such argument is that the framers of the Constitution certainly did not intend to limit its operation to telegraph companies, as, otherwise, the additional words—"and other corporations engaged in the business of transmitting intelligence for hire"—would become wholly unmeaning and useless. These additional words were manifestly inserted for some purpose, and it is impossible to conceive of any other purpose except to include every other corporation, by whatever name it may be called, and by whatever means it conducts its business, which may be "engaged in the business of transmitting intelligence for hire;" and as we have shown that a telephone company is engaged in that business, telephone companies must be regarded as included within the terms of the constitutional provision.

The reference to sec. 3 (manifestly a misprint for sec. 4),

of art. VIII., of the Constitution, and to the act of 1898, 22 Stat., 779, and also act of 1898, 22 Stat., 780, to support respondent's contention, will next be considered. This constitutional provision simply forbids the General Assembly from passing any law "granting the right to construct and operate a street or other railway, telegraph, telephone or electric plant, or to erect water or gas works for public uses, or to lay mains for any purpose, without first obtaining the consent of the local authorities in control of the streets or public places proposed to be occupied for any such or like purposes." What possible bearing this provision can have upon the question we are considering, to wit: whether a telephone company can be regarded as, in any sense, a common carrier, it is impossible to conceive. Indeed, if it has any bearing at all, it would seem to be adverse to the contention of respondent; for it seems to recognize the idea that when a telephone company establishes its plant in a town or city, it devotes its property to public uses, and thus brings it under legislative control. Nor do we see the relevancy of the two acts above referred to. The former forbids telephone companies from making unreasonable discrimination in the rates at which they furnish telephonic service to its patrons; and this necessarily implies that its business is subject to legislative control. The other act simply invests the railroad commission with power to regulate the charges of express companies for transportation and the charges of telegraph companies for the transmission of messages. But until it is shown, as it has not and cannot be shown, that the power to regulate charges by law, is a feature essential to the business of a common carrier, the provisions of this act do not even tend to show that a telephone company is not a common carrier. Indeed, as matter of fact, the rates of charges by all classes of common carriers, for example, steamboat companies, are not regulated by law.

But even if there were no constitutional provision and no legislation upon the subject, we are of opinion that this question is settled by the principles of the common law, which

being elastic in their nature, may be applied to subjects and conditions which have but recently become known and used in the business of the country. In this State, we have no case, so far as we are informed, upon the question whether a telephone company is, in any sense, a common carrier; and we have only two cases relating to the somewhat analogous question as to whether a telegraph company is a common carrier, viz: *Aiken* v. *Telegraph Company,* 5 S. C., 358, and *Pinckney* v. *Telegraph Company,* 19 S. C., 71; but neither of these cases decides that a telegraph company is, in no sense, a common carrier, though the contrary seems to be supposed (erroneously, as we think,) by some. Both of these actions were brought to recover damages for errors in the transmission of messages sent over the lines of the telegraph company occasioned by the alleged negligence of the defendant companies. In neither of these cases was the question made or decided as to whether a telegraph company was a common carrier. On the contrary, in the Aiken case, Willard, J., in delivering the opinion of the Court, uses language implying that a telegraph company is a common carrier, for on page 370 he says: "It is a contract with one exercising a public employment under express statute powers created for that purpose. The nature of the occupation of that class of persons and the tender of their services to the community make them common agents for the transmission of messages for all persons who may desire and pay for such services to any person, either as the final receiver of such message or as a means or agent for its further transmission. The object of the contract is to modify and limit the contract which, by operation of law, would arise between the common carrier of messages and any person employing such carrier, in the absence of any stipulation of terms between them. The foundation of the contract is the nature of the carrier's occupation and the fact of employment. The legal consequences flowing from such employment are what the special contract seeks to modify or limit." It is true, that on the next page the learned Justice

does say: "The regulation of the defendants in conformity with which the terms of the contract limiting their liability was made was a reasonable regulation, and such as the defendants were authorized to make. In examining the proposition just stated, it must be borne in mind that the analogy between common carriers of goods and common carriers of messages is not perfect. The nature of the services performed differs materially in the two cases, and the real responsibility differs in a corresponding manner." That case, therefore, as we understand it, simply decides that where a telegraph company agrees to send a *night* message, which it is not bound to send under certain stipulations as to its liability in case of errors in the transmission of such message, such stipulations are reasonable and may be enforced, but the case throughout recognizes the doctrine that a telegraph company is a common carrier; though the analogy between common carriers of goods and common carriers of messages is not perfect, owing to the fact that the nature of the services rendered differs materially in the two cases, and hence the measure of responsibility for any default in rendering the services must likewise differ. So in the Pinckney case, *supra,* the Court while not undertaking to decide whether a telegraph company could in any sense be regarded as a common carrier, as no such question was presented in that case, simply decided that a telegraph company was not held to the stringent rule of the common law whereby common carriers of goods were held liable for all such losses and damages as they could not show resulted from the act of God or the public enemy, but were only liable for all such losses and damages as they could not show were not due to the fraud or negligence of their agents or servants; and the reason for such a limitation of the rule was found in the peculiar nature of the business in which a telegraph company is engaged, differing in material respects from that of common carriers of goods. While it is true that the late Chief Justice Simpson, in delivering the opinion of the Court, does use some expressions which may possibly seem to indicate that

he thought a telegraph company was not a common carrier, yet that was not a question in the case, and, therefore, such expressions, even if amounting to what is claimed for them, are not authoritative. For, as the learned Chief Justice himself says on page 82, there is but a single question in the case, and he thus states that question: "the question to be considered, therefore, is whether telegraph companies are liable for all mistakes made in the transmission of messages except such as occur from any act of God or irresistable force, the *onus* of showing which is upon them."

In other jurisdictions, however, the question has been made and distinctly decided. Amongst the various cases which we have consulted we cite first the case of *The State* v. *Nebraska Telephone Company,* 17 Neb., 126, reported, also, in 52 Am. Rep., 404. In that case the facts were in substance very similar to the facts in the case which we are now called upon to decide, and it was there held that a telephone company cannot arbitrarily or capriciously refuse its facilities to any person desiring them and offering compliance with its reasonable regulations, and that mandamus will issue to compel the company to do its duty. The facts of that case were substantially as follows: The relator made an arrangement with the defendant company to place an instrument in his office, but for some reason failed to furnish the relator with a directory or list of its subscribers, with their numbers, which relator claimed was essential to the profitable use of the telephone, and which it was the custom of the company to furnish to its subscribers. After a time such list was furnished to the relator by the company, but when called upon by the company to pay for the use of the telephone in his office, the relator refused to pay for the use of the telephone during the time the company was in default in furnishing the directory or list of subscribers. Thereupon the defendant company removed the telephone from the office of the relator. Subsequently, the relator applied to the company to become a subscriber and to have an instrument placed in his office, which the company refused to do; where-

upon the relator applied for a writ of mandamus to compel the company to comply with his demand. In that case the Court proceeded upon the fundamental doctrine that when a person or company, especially one who is exercising its franchises under its charter, devotes its property to a public use by undertaking to supply a demand which "is affected with a public interest," it must supply all alike, who are alike situated, and cannot discriminate in favor of or against any one. In the course of the opinion, the Court uses the following language: "That the telephone, by the necessities of commerce and public use, has become a public servant, a factor in the commerce of the nation, and of a great part of the civilized world, cannot be questioned. It is, to all intents and purposes, a part of the telegraphic system of the country, and in so far as it has been introduced for public use and has been undertaken by the respondent, so far should the respondent be held to the same obligation as the telegraph and other public servants. It has assumed the responsibilities of a common carrier of news. Its wires and poles line our public streets and thoroughfares. It has, and must be held to have, taken its place by the side of the telegraph as such common carrier."

So in *Chesapeake and Potomac Telephone Company* v. *Baltimore and Ohio Telegraph Company,* 66 Md., 399, reported, also, in 59 Am. Rep., 167, Alvey, C. J., in delivering the opinion of the Court, uses this language: "The appellant (the telephone company) is in the exercise of a public employment, and has assumed the duty of serving the public while in that employment * * * The telegraph and telephone are important instruments of commerce, and their services as such have become indispensable to the commercial and business public. They are public vehicles of intelligence, and they who own and control them can no more refuse to perform impartially the functions that they have assumed to discharge than a railroad company, as a common carrier, can rightfully refuse to perform its duty to the public. They may make and establish all reasonable and proper

rules and regulations for the government of their offices and those who deal with them, but they have no power to discriminate, and while offering (themselves as) ready to serve some, refuse to serve others. The law requires them to be impartial and to serve all alike, upon compliance with their reasonable rules and regulations."

Again, in *The State of Missouri ex rel. Baltimore and Ohio Telegraph Company* v. *Bell Telephone Company of Missouri,* 23 Fed. Rep., 539, decided in 1885, Judge Brewer, now one of the Associate Justices of the Supreme Court of the United States, after laying down the general principle that a corporation deriving its franchises from its charter, which devotes its property to public uses, puts its property into the channel of commerce, and thereby becomes subject to the control of the law regulating such commerce, uses this language: "A telephonic system is simply a system for the transmission of intelligence and news. It is, perhaps, in a limited sense and yet in a strict sense, a common carrier. It must be equal in its dealings with all." That case seems to have been carried by writ of error to the Supreme Court of the United States, but was never considered by that Court, for in 127 U. S., 780, we find this simple statement: "Dismissed with costs on the authority of the plaintiff in error," 18 April, 1888. In 25 Am. & Eng. Ency. of Law, at page 750, we find the following: "Telephone companies like telegraph companies are to some extent common carriers, and are bound to afford equal facilities to all. They can be compelled by mandamus to furnish facilities to one offering to comply with their regulations, even though such a party is a rival company." To same effect, see page 775 of same volume, and on page 776 it is said: "In many of the States statutes exist which provide for the enforcement of these obligations; but it seems that the rule would be the same whether the obligation was declared by statute or considered as arising from the common law." For, as was said in *State* v. *Nebraska Telephone Company, supra,* in commenting on *State* v. *Bell Telephone Company,* 36 Ohio St., 296, where

there was a statute upon the subject: "So far as the obliga-
tions of the telegraph companies are defined by the act (ex-
cept the payment of the penalty), they are simply declarative
of the common law.    These obligations are imposed by the
demands of commerce and trade, and it would be idle to say
they existed only by force of the statute, and the same is true
of the clause of the act making its provisions applicable to
telephones."    Again, it is said in the same case: "Similar
questions have arisen in and have been freqnently discussed
and decided by the Courts, and no statute has been deemed
necessary to aid the Courts in holding that where a person or
company undertakes to supply a demand which is 'affected
with a public interest,' it must supply all alike who are like
situated, and not discriminate in favor of nor against any."
It is true, that in the more recent edition of the Encyclo-
pædia above referred to, the rule is stated in a more modified
form, see 6 Ency. of Law (2d ed.), at page 261, where
the following language is used: "It was at one time at-
tempted to class telegraph companies as common carriers,
but the view universally adopted now is that they can in no
sense be regarded as common carriers; *they are like common
carriers in that they are bound to serve impartially all those
applying to them,* but they are liable for improper transmis-
sion of messages only upon proof of negligence."    So that
it is apparent from the language which we have italicized in
the foregoing quotation, that the rule, even when stated in
its modified form, supports the contention of the relator, as-
suming, as we are authorized to do by the authorities, that
the rule applicable to telegraph companies is also applicable
to telephone companies—at least, so far as the obligation to
serve all alike who apply for the use of the facilities which it
offers to the public for the transmission of news is concerned.
    We are satisfied, therefore, that while a telephone com-
pany may not be, in every sense of the terms, a common car-
rier of goods, and as such subject to the same stringent rules
which govern in ascertaining the liability of such carriers,
yet, in one sense at least, it is a common carrier of news, and

as such bound to supply all alike, who are in like circumstances, with similar facilities, under reasonable limitations, for the transmission of news, without any discrimination whatsoever in favor of nor against any one; and this is so under the well settled principles of the common law, without the aid of any constitutional or statutory provision imposing such an obligation. ⌐ The answer to the second question, under what has already been said, must necessarily be in the affirmative.

To dispose of the third question, it will be necessary to recur somewhat to "the circumstances of this case." The undisputed facts are that the respondent, in the exercise of its franchise conferred by its charter, had established a telephone business in the city of Spartanburg, and had erected its poles and strung its wires in and along the streets of said city, and thus had become, at least, *a quasi* common carrier of news, and as such was under an obligation to serve all alike who applied to it within reasonable limitations, without any discrimination whatsoever. When, therefore, the relator applied to the respondent to replace the telephone instruments in his grocery store and in his residence, from whence they had been removed by the defendant company but a few days before, the respondent was, in our opinon, bound to comply with such demand, under the obligations to the public which it had assumed. The reason given for its refusal—that the relator refused to agree that he would use respondent's telephone system exclusively—was not sufficient to relieve it from its obligation to serve the public, of which the relator was one, without any discrimination whatsoever; and especially is this so when it was admitted that the respondent was, at the time, affording to one person, at least, who was engaged in the same business as that of the relator, whose place of business was on the same street of the same city, the same facilities which the relator demanded, without requiring any such stipulation as that required of the relator, but who was, in fact, using both telephone systems. It seems to us that the respondent, after

7—61

offering to the public its telephone system for the transmission of news, would have no more right to refuse to furnish the relator its facilities for the transmission of news unless he would agree not to use the Bell Telephone system in operation in the same city, but use exclusively respondent's system, than a railway company would have to refuse to transport the goods of a shipper, unless such shipper would agree to patronize its line exclusively and not give any of its business to any competing railway line. Nor does the fact (if fact it be) that the relator had committed a breach of its previous contract with respondent, when he purchased Holland's market, in which an instrument of the Bell Telephone Company had been placed, and had thereby acquired the right to use the Bell Telephone, afford any reason why the respondent should decline to comply with relator's demand to furnish his grocery store and residence with its telephone instruments. If the relator had committed any breach of its previous contract with the respondent of which the latter had any legal right to complain, its remedy, as was said in one of the cases which we have consulted, was by an action to recover damages for such breach of contract, but not by refusing to perform its obligation to the public, of which the relator was one. As to the other reason suggested why the mandamus prayed for should not issue under the circumstances of this case, to wit: that respondent did not have the means to comply with the demand of the relator within less than sixty days, it is only necessary to repeat what we have said above: that there does not appear to be any evidence in the "Case" to sustain the fact upon which this suggestion is based, and, therefore, it cannot now be considered. Besides, as is said above, that is a matter which may be considered when the case goes back to the Circuit Court, which can, in ordering the mandamus to issue, as herein directed, make suitable provision for allowing respondent reasonable time, if such shall be shown to be necessary, to comply with relator's demand.

As to the position taken in the argument—that

mandamus is not the proper remedy—we think it entirely clear, both upon principle and authority, that mandamus is the appropriate remedy in a case of this kind.

The judgment of this Court is, that the judgment of the Circuit Court be reversed and that the case be remanded to that Court, with instructions to carry out the views herein announced.