CUMBERLAND TELEPHONE & TELEGRAPH CO. v. KELLY.

(Circuit Court of Appeals, Sixth Circuit.  March 17, 1908.)

No. 1,741.

1. TELEGRAPHS AND TELEPHONES—QUASI PUBLIC CORPORATIONS—DISCRIMINA-
   TION.

   Both telephone and telegraph companies are engaged in a quasi public
   service, and hence, without regard to statute, are required to serve the
   public without partiality or discrimination.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Telegraphs and
   Telephones, § 21.]

2. SAME—STATE STATUTES.

   Acts Tenn. 1885, p. 122, c. 66, § 11, provides that every general tele-
   phone company doing business within the state, shall supply all applicants
   for telephone facilities, without discrimination or partiality, provided they
   comply with the reasonable regulations of the company, which shall not
   impose any condition or restriction on any such applicant not imposed
   impartially upon all persons or companies in like situations, nor shall
   such company discriminate against any individual or company engaged in
   lawful business, by requiring, as a condition for furnishing such facili-
   ties, that they shall not be used in the business of the applicant or other-
   wise, under penalty of $100 for each day the company continues such dis-
   crimination and refuses such facilities, after compliance or offer to com-
   ply with the reasonable regulations, and time to furnish the same has
   elapsed. *Held*, that such act is directed only against discrimination, giv-
   ing a new remedy, and imposing severe penalties, and was merely declara-
   tory of the common law.

3. STATUTES—CONSTRUCTION.

   Where a statute in general terms is merely declarative of the common
   law, or an affirmance thereof, it should be construed as near to the rule
   and reason of the common law as may be, and by the course which the
   common law observes in other cases.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, § 301.]

4. TELEPHONES—DISCRIMINATION—PENALTIES.

   Where, in an action for statutory penalties against a telephone company
   for discrimination, prohibited by Acts Tenn. 1885, p. 122, c. 66, § 11, the
   court charged that, in determining whether discrimination existed as
   against plaintiff in the territory where he was situated, the jury could
   only look to the situation in that locality, and determine whether the com-
   pany furnished other men on application for service, when their cable
   lines were filled, and that the company could not exercise its discretion
   to furnish one class of citizens or one citizen, and deny others, an instruc-
   tion that if two applicants for service were in the same business, and
   one was granted service and the other not, that would constitute dis-
   crimination, was objectionable, in that it was not also based on the as-
   sumption that the applicants were "similarly situated."

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Telegraphs and
   Telephones, §§ 16, 18, 21.]

5. SAME—CHARACTER OF SERVICE.

   Defendant telephone company, being required to place its wires in the
   business portion of a city in conduits, maintained direct and party line
   service, the wires being carried in cables from the central exchange to
   different division points in the city, and thence on poles to the various
   telephones with which they were connected.  When the wires carried in
   each cable were all in use, new patrons could not be supplied with direct
   service until another cable could be constructed and carried to a point of
   distribution, or until some pair of wires in the cable became vacant by the
   telephone being given up.  The practice of the company was also to serve

applicants in the order of their application. *Held* that, where the cable leading to plaintiff's district was full when plaintiff applied for direct service, the fact that other patrons for party line service in plaintiff's district were furnished service prior to plaintiff, did not constitute a discrimination against him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Telegraphs and Telephones, §§ 16, 18, 21.]

**6.** SAME—ENLARGEMENT OF PLANT.

Telephone companies are under a general common-law obligation to supply reasonably adequate facilities, which obligation may be enforced by compelling the enlargement of the plant, but this duty is not so far applicable to Acts Tenn. 1885, p. 122, c. 66, § 11, requiring telephone companies to furnish facilities without discrimination and imposing severe penalties, as to require a departure from the company's usual custom in the service of patrons, and an increase of the company's cables for the purpose of serving an applicant whose application could not be immediately complied with because the company's cable running to his district was full.

**7.** SAME—SPECIAL CONNECTIONS.

Where a telephone company's cable, leading to plaintiff's district, was full, so far as direct service was concerned, at the time plaintiff applied therefor, the telephone company was not chargeable with discrimination for failing to give plaintiff service by indirect and exceptional means, contrary to custom, and only resorted to in case of urgent necessity on a special application, plaintiff not having brought himself within the conditions under which such connections were allowed.

In Error to the Circuit Court of the United States for the Western District of Tennessee.

This was an action to recover statutory penalties under chapter 66, § 11, p. 122, Acts Tenn. 1885. That act is one granting certain privileges to telegraph and telephone companies "and prohibiting discrimination between patrons." The eleventh section is in these words:

"Every telephone company doing business within this state, and engaged in a general telephone business, shall supply all applicants for telephone connection and facilities without discrimination or partiality, provided such applicants comply or offer to comply with the reasonable regulations of the company, and no such company shall impose any condition or restriction upon any such applicant that are not imposed impartially upon all persons or companies in like situations, nor shall such company discriminate against any individual or company engaged in lawful business by requiring as condition for furnishing such facilities that they shall not be used in the business of the applicant or otherwise, under penalty of one hundred dollars for each day such company continues such discrimination and refuses such facilities after compliance or offer to comply with the reasonable regulations, and time to furnish the same has elapsed, to be recovered by the applicant whose application is so neglected or refused."

The plaintiff below set out this section and averred that the defendant was a corporation carrying on a telephone business in the city of Memphis; that he resided in said city; that he applied for a direct connection at his residence, and signed an application agreeing to comply with the terms and regulations of the company on September 8, 1905; and that his application was accepted on same day. He then averred that the defendant had violated the said provision of the Tennessee Act of 1885, "in that it failed to give him telephone connection and facilities and furnished others in the same class and in like condition as himself with telephone connection and facilities, thereby violating the above law and discriminating against him." He then averred that the discrimination continued until November 28, 1905, and that the time within which such connection could have been supplied was 78 days; he therefore sued for the penalty prescribed by the statute for the said 78 days, making an aggregate penalty of $7,800. The defendant pleaded

the general issue and a special plea in these words: "And for further plea in its behalf, defendant avers that, at the time that the plaintiff herein requested the installation of a telephone at his residence, the defendant company did not have, and could not by any due diligence have had, sufficient line and wire equipment for the installation of a telephone service at that time; and that it could not have installed said telephone any sooner than it did; and this it is ready to verify."

There was a verdict for the full amount of $7,800. The defendant has assigned error, and sued out this writ.

E. E. Wright, for plaintiff in error.

George Harsh, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge (after stating the facts as above). The analogy between the principle which determines the duties and responsibilities of telephone and telegraph companies and those which apply to common carriers of goods and persons is so strong that it is often said of them that they are "common carriers of news." The description is more applicable to telegraph companies than to telephone companies, for the one receives and sends a message, the other merely supplies the facilities by which the user may extend the compass of his own voice. Nevertheless, both telephone and telegraph companies are engaged in a quasi public cervice and are endowed with some of the sovereign powers of the state. Therefore it is well settled that, without regard to statute, both kinds of companies must serve the public without partiality or discrimination. In the case of the State of Missouri v. Bell Telephone Co. (C. C.) 23 Fed. 539, 541, Justice Brewer said:

"A telephonic system is simply a system for the transmission of intelligence and news. It is, perhaps, in a limited sense, and yet in a strict sense, a common carrier. It must be equal in its dealings with all. It may not say to the lawyers of St. Louis, 'My license is to establish a telephonic system open to the doctors and the merchants, but shutting out you gentlemen of the bar.' The moment it establishes a telephonic system here, it is bound to deal equally with all citizens in every department of business; and the moment it opened its telephonic system to one telegraph company, that moment it put itself in a position where it was bound to open its system to any other telegraph company tendering equal pay for equal service."

In Delaware & A. Tel. & Tel. Co. v. Delaware, 50 Fed. 677, 2 C. C. A. 1, the Circuit Court of Appeals for the Third Circuit said:

"It is no longer open to question that telephone and telegraph companies are subject to the rules governing common carriers and others engaged in like public employment. This has been so frequently decided that the point must be regarded as settled. While it has not been directly before the Supreme Court of the United States, cases in which it has been so determined are cited approvingly by that court in Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247. While such companies are not required to extend their facilities beyond such reasonable limits as they may prescribe for themselves, they cannot discriminate between individuals of classes which they undertake to serve."

This principle has been recognized over and over again in respect of many classes of business affected with a public interest, and cases applying to the telephone companies have been cited and approved by the Supreme Court as justifying the regulation by statute of analogous

kinds of business. Budd v. New York, 143 U. S. 517, 542, 12 Sup. Ct. 468, 36 L. Ed. 247. The cases directly holding telephone companies to the obligation of an impartial and undiscriminating service upon common-law principles are numerous. Some of these are: Chesapeake, etc., Telephone Co. v. B. & O. Ry. Co., 66 Md. 399, 414, 7 Atl. 809, 59 Am. Rep. 167; Hockett v. State, 105 Ind. 250, 258, 5 N. E. 178, 55 Am. Rep. 201; Central Union Telephone Co. v. State, 106 Ind. 1, 5 N. E. 721; State v. Citizens' Telephone Co., 61 S. C. 83, 39 S. E. 257, 55 L. R. A. 139, 85 Am. St. Rep. 870. The textwriters state the duty in the same way. Joyce on Electric Law, vol. 2, § 520; James on Telegraphs and Telephones, pp. 229, 239; 27 Am. & Eng. Enc. of Law, p. 1021. Telegraph companies are equally obligated by the common law against discrimination. Western Union Telegraph Co. v. Call Publishing Co., 181 U. S. 92, 21 Sup. Ct. 561, 45 L. Ed. 765. Statutes enforcing this common-law liability not to discriminate are therefore merely in affirmance of the common law. 27 Am. & Eng. Enc. of Law 1021, 1022; Central Union Telephone Co. v. Fehring, 146 Ind. 189, 45 N. E. 64; State v. Nebraska Tel. Co., 17 Neb. 126, 22 N. W. 237, 52 Am. Rep. 404; State v. Citizens' Tel. Co., 61 S. C. 83, 39 S. E. 257, 55 L. R. A. 139, 85 Am. St. Rep. 870; State v. Bell Tel. Co., 36 Ohio St. 296, 38 Am. Rep. 585. Neither is there anything in the Tennessee statute, set out heretofore, which adds anything to the common-law obligation of such companies. A new remedy is given and severe penalties are imposed for nonobservance, but the statute is directed only against discrimination. The contention underlying the whole argument of the attorney for the defendant in error, rather than directly advanced, that under this statute such companies are required to "supply all applicants" for service without regard to their location within the limits of territory to which they have in good faith confined their facilities, would lead to absurd results, and make the conduct of such a business practically impossible. The statute must be sensibly contrued, and general terms so limited in their application by the context as not to lead to injustice or oppression. To avoid absurd consequences, it was said in U. S. v. Kirby, 7 Wall. 482, 486, 19 L. Ed. 278, the courts, when possible, "will presume that the Legislature intended exceptions to its language which will avoid results of this character." This general principle of statutory construction has been again and again applied. Some of the cases are: Chew Heong v. United States, 112 U. S. 536, 5 Sup. Ct. 255, 28 L. Ed. 770; Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226; Bate Refrigerating Co. v. Sulzberger, 157 U. S. 37, 15 Sup. Ct. 516, 39 L. Ed. 601. In the last-cited case the court said:

"Undoubtedly the court, when endeavoring to ascertain the intention of the Legislature, may be justified, in some circumstances, in giving weight to considerations of injustice or inconvenience that may arise from a particular construction of a statute."

Verbiage which is supposed to impose the duty of supplying all applicants is taken out of its context. The subject-matter of the eleventh section is the prevention of "discrimination"—the avoidance of "partiality." The mandate of the statute is that applicants shall not be

discriminated against, not that all shall be supplied, regardless of location or conditions. Neither does the provision disregard the usual and approved methods upon which such a business is conducted and compel a service under conditions forbidden by general regulations adopted in good faith as conducive to efficiency of service and economy of operation. We must presume that the right of such companies to conduct their business in the usual and approved manner of such utility companies is not prohibited, and that a service delayed in consequence of such business conditions is not, when all similarly situated are subject to same regulations, a discrimination penalized by the law. This section is identical with an Arkansas statute and another of Indiana, which are, apparently, the only other states imposing such penalties. In Irvin v. Rushville Co-operative Tel. Co., 161 Ind. 524, 69 N. E. 258, the Indiana court said that "the statute travels on the assumption that telephone companies may make reasonable rules," and that a service denied under a rule providing for a denial or delayed under such circumstances is not a discrimination unless it is averred and proven that it had not been impartially applied. The Arkansas court, construing the same provision, held that a pleading which alleged that the defendant telephone company had failed to furnish him with a telephone after repeated applications "had thereby discriminated," stated no case, as no fact was thereby stated which showed that he had been discriminated against. In this case the plaintiff escaped this rock in his amended declaration by averring that the defendant violated the law "in that it failed to give him telephonic connection and facilities and furnished others in the same class and like conditions with himself," etc. Neither does this statute apply to a case of mere negligence. The penal clause of the act, "under penalty of one hundred dollars for each day * * * and time to furnish the same has elapsed, to be recovered by the applicant when application is so neglected or refused," is merely descriptive of the applicant who has been discriminated against. Thus the brief of the learned counsel for the defendant in error frankly concludes by saying, "We do not think they would be liable for a case of inadvertent negligence." But, whether conceded or not, it is plain that a mere negligent or accidental omission to supply a telephone would not involve an intentional discrimination against the plaintiff in favor of other applicants similarly situated. The cases construing such statutes in relation to discriminations by telegraph companies holding that mere negligence is not penal discrimination are numerous and apply. State v. Western Union Telegraph Co., 76 Ark. 124, 88 S. W. 834; Western Union Telegraph Co. v. State, 146 Ind. 63, 44 N. E. 793; Western Union Telegraph Co. v. Swain, 109 Ind. 405, 9 N. E. 927; Fox v. Francher, 66 Mich. 536, 33 N. W. 416; Hearn v. Western Union Telegraph Co. (Sup.) 73 N. Y. Supp. 1077.

These conclusions support the view stated above, that the Tennessee act of 1885 is only declaratory of the common-law duty not to discriminate, and enforcing that obligation by penalties. It follows, therefore, that conduct which would not amount to an illegal discrimination by such a public service company at the common law would not be an illegal discrimination under the statute. Not only is this statute to

be read in the light of the common law, but we must assume, as before stated, that the severe penal provisions against discrimination were imposed with knowledge of the character of the peculiar business regulated, and without any purpose to interfere with the methods for the conduct of such business usual with such companies, and calculated to insure efficiency of service with reasonable business economy. When a statute is merely declarative of the common law, or in affirmance of it, and is in the general terms of the common law, there is no safer rule for its construction than that so well stated by Sutherland upon Statutory Const. § 290, that "the best construction of a statute is to construe is as near to the rule and reason of the common law as may be, and by the course which that observes in other cases." This construction of the Tennessee act does not appear to have been observed by the learned trial judge. After distinctly recognizing that the one intent and purpose of the act was to enforce the obligation of nondiscrimination by saying to the jury, "that the keynote of the lawsuit is the question of discrimination as against the plaintiff in favor of somebody else similarly situated," the court said:

"We must take the law as we find it written by the Legislature, and if you believe from the testimony (and it has gone before you almost without an exception by either counsel), that this telephone company, in the territory which it proposed to serve, has furnished applicants and was furnishing them, at the time of the bringing of this suit and before, telephonic connection, and that this man, the plaintiff here, Mr. Kelly, made his application and did all that was required of him to do, and that he was similarly situated as were those for whom they were supplying the telephone connection at the time, and they declined to supply him, then they were liable to him for one hundred dollars for every day which they declined and refused to furnish him that connection. Discrimination means, under this statute, taking men similarly situated: that the company, while furnishing one man telephonic connection, declines to furnish the other, or failed to do it. Much has been said about the purpose of the law. Evidently the intention of the Legislature was to prevent the telephone company from serving one citizen and, then, to favor him, refuse to serve another citizen similarly situated. To illustrate the idea: Here is a man on this corner who is in the grocery business, and here is a man just across the street who is in the grocery business. The first grocer referred to makes application for telephone connection and he gets it, and is put in connection with all the subscribers of the telephone company—to business houses. The other puts in his application, and complies with all the reasonable rules of the company, and he does not get it, and he is not put in connection with all the subscribers of the company. Now, it is that class of thing that the law was intended to remedy and prevent."

If we assume this illustration to apply to grocers "similarly situated," and the company was or should have been under the conditions able to serve both without preferring one over the other, it was not misleading. But this can not be indulged in in view of the definition of "discrimination" which immediately followed. Upon this subject the court said:

"In determining whether there was discrimination or not as against this man in the territory where he was situated, you may look to the testimony, and consider the situation in that locality. Had the company furnished other men on application for service in that locality when their cable lines or cables were filled? Could they make arrangements to supply other men, and did they do it? Or, on the other hand, did they treat them all alike when that condition of things appertained? This statute here has made no ex-

ception wherein the company might exercise its discretion to furnish one class of citizens—one citizen who happened to be in distress—and deny to somebody else. There is nothing written in the law about that, and I can't therefore charge you that the law is that way, but we take the statute, as I said, as it is here."

The effect of this was to cut up by the roots the defense of the plaintiff in error growing out of the evidence as to the usual and customary method of conducting the telephone business. The undisputed evidence showed that the Cumberland Telephone Company had constituted and maintained a telephone exchange in the center of the city. To furnish direct line service, which was the service the defendant in error applied for, it is necessary to provide for the exclusive use of each patron two wires having their termini at the central exchange and at the place where the service is desired. Necessarily all of these direct service wires converge at this exchange. Where, as at Memphis, service is supplied to thousands of patrons, these converging wires are numerous. There was an ordinance which required all such connecting wires to be placed in conduits underground, and thus carried through the business district of the city as defined by law. In compliance with the practice and the most efficient system adopted by such companies, those parts of the city which this company proposed to serve were divided into service districts, and the wires serving that district were bunched into one or more cables and inclosed in lead and in this condition carried underground to the border of the conduit district. The plaintiff below lived five blocks north of Poplar street, and was within the area served by the Poplar and High street cable, which came out of the ground at Poplar and was thence run up a pole at that point and became a part of the aërial system. At a convenient point this cable is run into a cable box situated upon one of the company's poles, from which box were distributed the various wires supplying the various telephones within this cable district. In this manner the wires were carried from the exchange to convenient points of distribution. When the wires carried in such a cable were all in use the cable was said to be full, and new patrons could not be supplied with direct service until another cable could be constructed and carried to a point of distribution or until some pair of wires became vacant by a telephone being given up. The cable supplying the district in which the defendant in error lived was full when he made his application, and there were a number of applications for service in advance of his. The practice and rule of the company was to serve applicants in the order of their application. This was necessary to prevent discrimination. There was conflicting evidence as to whether defendant in error was advised that the cable was full, and that he could not be served until those ahead of him had been, and none supplied until wires were given up or the company's facilities enlarged by new construction. He does, however, admit that, after some delay had occurred, he was informed that the delay was due to want of cable capacity to supply him at once. The evidence was that the plan and method upon which the Cumberland Company conducted its business was up to date, and in accord with that used by the best managed companies. There was some evidence showing that other applicants were served while defendant in error was kept wait-

ing. But all such service was to parties applying for a party line. This kind of service is where a number of telephones are served by one pair of wires with which every party on the pair is connected by individual wires. That plan is very inconvenient, and much cheaper. Defendant in error could have had that kind of service without delay. That he did not want. His application was for "direct" service, by which is meant the exclusive use of a pair of wires running into the exchange through the local cable. There was, therefore, no sort of discrimination in supplying other applicants with party wire service, and defendant in error made no point on this. Neither was there any evidence that any later applicant, within his service district, was supplied with direct service, on any plan after Kelly's application was received.

What, then, was the basis for the claim of a violation of this statute? For one thing it is said that, during the time of delay, other applicants in other parts of the city were given connection. But as these other applicants were within other cable districts in which the cables were not congested, this cannot be said to be a discrimination. This is not evidence of partiality shown them, and was not a discrimination against Kelly, who was not similarly situated. Of course, if we are to construe this statute as one which overrides the business methods under which the company carried its wires in cables to the different areas to be served, distributing the wires from stations conveniently located within such business or cable districts, then, to serve any applicant anywhere ahead of Kelly, would be an illegal discrimination. But such a construction would lead to most unjust results, and practically destroy every such company. If such a company, in good faith, determines for itself the limits within which it will conduct such a business, and if in accordance with the usual and approved methods of well-managed companies, it divides that area into districts to be served by wires carried in cables to a point within it convenient for distribution, there is no discrimination at common law or under the statute, unless an applicant within a particular district is discriminated against and others served within the same general area, in like situation and under like conditions with himself. This was the view of the matter entertained by the court below, for the jury were instructed that the question of discrimination depended upon the conduct of the company in "the territory where he was situated," and the case was made to turn by the charge upon the question, "Had the company furnished other men on applications for service in that locality when their cable lines were filled?" "Could they make arrangements to supply other men and did they do it? Or, on the other hand, did they treat them all alike when that condition of things appertained?" The suggestion made here in argument, that it was the immediate duty of the company to provide additional wires if all those in the existing cable were in use, and that the failure to do this was a discrimination under the statute, was not by any charge given or refused raised below, and is only relevant here as arising under the alleged general purpose of the statute to compel the service of all applicants regardless of conditions and methods of carrying on such a business. We have already expressed our view of this above. There might be much in the sugges-

tion, if the business of the company had been carried on by giving to each applicant an aërially supported pair of wires running direct from the exchange to each private telephone. If it had also appeared that it was the practice and custom of the company to put up such a pair of wires whenever service was required, there would be evidence tending to show discrimination if such connection should be denied or unduly delayed to one and furnished to others. That method of doing business, as we may judicially take notice, does prevail where the patrons are few in number. But there was evidence tending to show that where the patrons run up into the thousands, the cable system, to avoid confusion of wires, becomes necessary for efficient service. In Memphis the city ordinance compelled the wires to go underground through the business part of the city, and this, aside from other considerations, involved the carrying of the wires deemed necessary for the business of a particular district in leaden covered cables and their distribution from a box conveniently situated within the district. If the cable in a particular district should become congested it was usual, if the new business promised a fair return, to carry another cable to the same district and make a new point of distribution.

Telephone companies, like similar quasi public corporations, are under a general common-law obligation to supply reasonably adequate facilities for supplying the service which they hold themselves out to do. This obligation, in a proper proceeding, may be enforced by compelling an enlargement of the plant, or by an action for damages due to disregard of this duty. The principle applicable to common carriers proper is sufficiently stated with its qualifications in 5 Am. & Eng. Cyc. of Law, 167, 168, and many illustrative cases are cited. But we cannot conceive that this common-law obligation is within the intent and purpose of this severe penal act. If, as we have before stated, the business of the company was conducted by individual wires aërially supported between the exchange and the telephones of the patrons, and it was its usual custom to string a pair of wires upon the plant already provided when a new customer desired a telephone, a very different question would be presented. There was evidence tending to show that to put in a new cable in order to serve Kelly would have taken some weeks at least, and would have cost the company about $7,000, if such a cable was strung as they were using. We cannot believe that the Tennessee Legislature ever intended that the common-law duty of providing facilities reasonably adapted to the business which might have with reason been anticipated should be enforced by the imposition of an arbitrary penalty of $100 per day from the time when such connection might have been supplied had the company's cable capacity not been full. This construction would operate to ruin any ordinary company, with profit only to such as might choose to prosecute a penal action against them. No such construction ought to be placed upon such a penal statute if it be susceptible of a more just and reasonable one. This we have no difficulty in doing, inasmuch as we regard the statute as intended only to prevent a partial and discriminating service, having regard to the capacity of the company, and the usual and customary method under which its operations were conducted. The learned trial judge evidently held

this view of the law, for he made the case turn upon whether, notwithstanding a full cable in Kelly's district, the company had supplied other persons in that locality, and might have served him in the same way. But the charge upon this aspect of the case was misleading, as it drew no distinction between a direct and a party service.  The jury might well from the evidence have found that other men in the same district had been supplied with party lines.  But this would not have been a discrimination, inasmuch as that was not the service Kelly had asked for.

There was also some evidence tending to show that the company had a method of making a "direct" connection, for applicants residing within the area served by a cable which was congested, known as "backing up" or "jumping wires."  There was also evidence that the company sometimes "split a pair of wires" to make a connection.  Splitting a pair of wires was done when by electricity some of the wires in a cable were disabled, leaving others effective.  When one good wire of a pair was connected with another good wire of another pair this was called "splitting a pair."  Kelly contended that he might have been given a connection in the same way and that the failure of the company to so connect him was a discrimination.  To avoid such a conclusion the company gave evidence tending to show that splitting a pair could only be done when there were two bad pair to split, and that as it involved the loss of a pair of wires, was not resorted to except in extraordinary circumstances.  "Jumping a wire" or "backing up" consisted in taking a pair of unused wires from a cable supplying another area or cable district and carrying it aërially into the cable box of another district from which they were extended to the phone to be connected.  The evidence of the company, as well as that of the plaintiff, tended to show that this was an impracticable method by which the wires from one cable get mixed up with those from another, making it difficult to discover wires "in trouble."  The general manager of the company described it as a method by which the central exchange is likely to get into "a general mess."  As a deleterious plan tending to affect the efficiency of the general service it was forbidden by the general manager of the company.  There was, however, evidence tending to show that the manager of the Memphis branch allowed it to be done upon special application and permission in cases of serious sickness in a family making an immediate connection emergent.  If making a direct connection by this unusual and deleterious plan was not resorted to capriciously and as a disguise for partiality, but under an exception grounded upon general and reasonable conditions, applicable to all in like circumstances, it would not constitute that intentional discrimination forbidden by the statute.  The defense presented by the evidence referred to was proper to have gone to the jury under a proper instruction as to its effect.  The charge of the court effectually excluded the defense from the jury, and was therefore error.  To constitute a discrimination it would devolve upon a plaintiff to show that he had been denied a connection by one or other of the unusual methods of connection referred to, although he had brought himself within the conditions under which that practice was resorted to.

We do not consider it necessary to consider other assignments, as what we have said is enough to indicate our view of the act, further than to say that the admission of evidence tending to show that there was some ill feeling between the telephone company and a brother of the plaintiff below was erroneous and prejudicial.

Judgment reversed, and remanded for a new trial.